## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
### Case No.: 7:13-cv-145-F

| | | |
|---|---|---|
| LISA COOPER, | ) | |
| | ) | **DEFENDANT'S LOCAL CIVIL RULE** |
| Plaintiff, | ) | **56.1 STATEMENT OF MATERIAL FACTS** |
| | ) | |
| v. | ) | |
| | ) | |
| THE SMITHFIELD PACKING | ) | |
| COMPANY, INC. | ) | **Fed. R. Civ. P. 56 & Local Civil Rule 56.1** |
| | ) | |
| Defendant. | ) | |

Pursuant to Rule 56.1 of the Local Rules of Civil Procedure for the Eastern District of North Carolina, Defendant, Smithfield Farmland Corp.[1] ("Smithfield" or "the Company"), respectfully submits this statement of material facts in support of its Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS

### A.  Smithfield's Business Operations

1.      Based in Smithfield, Virginia, Smithfield is a global leader in producing packaged meats. The Company is committed to responsible animal care, community involvement, employee safety, a commitment to the environment, and uncompromising food safety and quality programs.

2.      The events and allegations relevant to this case occurred at Smithfield's Tar Heel, North Carolina pork processing plant. ("Tar Heel").  Tar Heel is the largest slaughterhouse and meat-processing plant in the world.

### B.  Smithfield's Commitment to a Harassment-Free Workplace

3.      Smithfield has several policies and practices in place intended to promote a non-discriminatory work environment free from unlawful harassment.  The Anti-Harassment Policy ("Anti-Harassment Policy") is applicable to all employees in the Company's domestic operations, including the

---

[1] Plaintiff's Fourth Amended Complaint incorrectly identifies Defendant as "The Smithfield Packing Company, Inc."  On April 28, 2014, Defendant, The Smithfield Packing Company, Incorporated, merged with Farmland Foods, Inc.  The name of the merged corporation, which is now reflected in the initial paragraph, is "Smithfield Farmland Corp."

Tar Heel facility. The Anti-Harassment Policy is intended to "maintain a workforce that is free of threatening, intimidating or harassing conduct, including sexual harassment, offensive language and behavior regarding an individual's race, religion, gender, color, national origin, age, ancestry, physical disability, medical condition, or marital status." (Cooper Depo., Exh. 13, p. 1, Appx. H)[2]; (Pope Aff., ¶ 5; Exh. 2, Appx. M).[3] The policy lists numerous examples of prohibited conduct and expressly provides that "[a]ll complaints, whether formal or informal, must be reported to the Human Resources Manager or any member of management." (Cooper Depo., Exh. 13, p. 2, Appx. H); (Pope Aff., ¶ 5; Exh. 2, Appx. M).

4.     Smithfield also has a Code of Business Conduct and Ethics ("COBC"), which is applicable to all employees (domestic and foreign). The COBC prohibits "any deliberate discrimination or harassment, in word or action, against a fellow employee or applicant for employment." (Cooper Depo., Exh. 10, pp. 13-15, Appx. H); (Pope Aff., ¶ 5; Exh. 1, Appx. M). The COBC lists specific examples of prohibited conduct, including sexual harassment, and describes the process employees can use to raise concerns or complaints to various levels of management, or to Smithfield's legal department, at the employee's discretion. In pertinent part, the COBC states:

> Any employee who believes that harassment by a co-worker, supervisor or person doing business with or for the company has occurred should notify his or her immediate supervisor and/or personnel office. Complaints will be handled in a confidential manner and no individual will suffer any form of retaliation or reprisals for reporting any incidents of harassment or for making any complaints. If a complaint involves an immediate supervisor, it should be directed to the next higher level of supervision. A complaint can also be reported directly to the Smithfield Law Department.

(Cooper Depo., Exh. 10, p. 14, Appx. H); (Pope Aff., Exh. 1, Appx. M). As well, Smithfield maintains a toll-free "Employee Hotline," which provides employees the option of raising concerns anonymously. (Cooper Depo., Exh. 10, p. 26, Appx. H); (Pope Aff., ¶ 5, Appx. M).

---

[2] The transcript of the deposition of Lisa Cooper, which was taken on May 17, 2016, in Raleigh, North Carolina, is cited as "(Cooper Depo., p. ___, line(s) ____)." Exhibits to the deposition will be cited as "(Cooper Depo., Exh. ___, p(p). ___)." References to Defendant's Appendix to Local Civil Rule 56.1 Statement of Material Facts will be cited as "Appx. ___."

[3] The affidavit of Tar Heel's former Director of Human Resources, Jaime Pope, is cited as "(Pope Aff., p(p). ___)."

5.      All employees are required to be familiar with the COBC and to comply with its provisions as a condition of employment. (Cooper Depo., Exh. 10, p. 25, Appx H).  Smithfield conducts an annual business conduct certification intended to ensure that all employees read, understand, and agree to comply with the COBC, including those portions prohibiting sexual harassment and requiring the reporting of known violations. (Cooper Depo., Exh. 10, p. 26, Appx. G; Exhs. 11, 12, Appx. H ); (Pope Aff., ¶ 5.h, Appx. M).  The business conduct certification thus provides employees with an annual reminder that they are expected – indeed, required – to report violations of the COBC, including those involving alleged sexual harassment.

6.      During the time period relevant to this action, Smithfield made consistent and repeated efforts to ensure its employees at the Tar Heel facility were aware of the Anti-Harassment Policy, the COBC, and the Employee Hotline, including:

a.      Employees, both hourly and salaried, were provided with a copy of the COBC, as well as information on how to use the employee hotline, at the beginning of their employment during Smithfield's new employee orientation program.  Employees were required to sign off on having received this information.

b.      Copies of the COBC and information on the hotline were also available in the Tar Heel Human Resources office, which is located on site at the Tar Heel facility and readily accessible to employees.

c.      The Anti-Harassment policy was e-mailed to all plant management and administrative personnel.

d.      Copies of the Anti-Harassment policy and information on the hotline were physically posted on employee bulletin boards located in numerous areas throughout the plant.

e.      Copies of the COBC and information on the hotline were provided to the Union that represents the hourly employees working in the plant.

f.      Smithfield provided periodic training to Union stewards and to Company management personnel on best practices for addressing workplace issues, including dealing with complaints of workplace harassment.

g.      The Director of Human Resources at the Tar Heel facility directed operational managers and supervisors to periodically review the Anti-Harassment Policy, COBC, and other Company policies with employees and to answer any questions they had  about the policies (or to direct those questions to his attention).

(Pope Aff., pp. 2-3, Appx. M). It is undisputed that the Anti-Harassment Policy and the COBC were well-publicized and generally well-known by the employees at the Tar Heel facility. (Cooper Depo., pp. 112-113, 115-118, 123, Appx. G; Exh. 14, p. 7, Appx. H); (Pl. Doc. Prod., Exh. A, Appx. C). (D. Williams Depo., pp. 28-29, Appx. L)[4]; (Lowery Depo., pp. 55-58, Appx J).[5]

7.     When complaints of harassment were raised by employees working at Tar Heel, the facility's on-site Human Resources Department ("HR") customarily took several steps to investigate and respond. First, HR would interview the complaining party to determine the nature and potential severity of the complaint. HR would then determine whether any immediate remedial action was necessary to minimize or eliminate the interactions between the complaining party and the alleged harasser pending completion of the Company's investigation. HR personnel would then interview and obtain statements from both the complainant and the accused, and, if necessary and appropriate, from potential witnesses. Once the investigation was complete, Tar Heel's Director of Human Resources would review the information obtained and determine whether the complaint could be substantiated. HR would review the applicable policies with involved parties, as deemed appropriate. If the complaint was verified, HR would initiate disciplinary action against the accused in consultation with his or her management chain. (Pope Aff., pp. 3-4, Appx. M).

C.     **Cooper's Employment with Smithfield**

8.     The Plaintiff, Lisa Cooper ("Cooper"), was hired by Smithfield at the Tar Heel facility in November 1995, as a Scanner in the facility's shipping department. (Cooper Depo., p. 79, line 11, Appx. G). Cooper was assigned to the second shift. (Cooper Depo., p. 87, line 9, Appx. G). Approximately 8-9 months after she was hired, Cooper received a promotion to the position of second shift Crew Leader in the shipping department. (Cooper Depo., p. 87, lines 12-20, Appx. G).

---

[4] The transcript of the deposition of Diane Williams, which was taken on June 28, 2016, in Raleigh, North Carolina, is cited as "(D. Williams Depo., p. ___, line(s) ____)."

[5] The transcript of the deposition of Tommy Lowery, which was taken on June 28, 2016, in Raleigh, North Carolina, is cited as "(Lowery Depo., p. ___, line(s) ____)."

9.      At an unspecified date following her promotion, but long before the events giving rise to this lawsuit, Cooper complained to then-Plant Manager Larry Johnson ("Johnson") that her supervisor, Dan Perdue ("Perdue"), called her into his  office on a number of occasions, closed the shades, and attempted to touch her inappropriately. (Cooper Depo., pp. 89 – 94, Appx. G).   Johnson called Perdue into his office and questioned him about the incidents. (Cooper Depo., p. 93, lines 16-20, Appx. G). According to Cooper, Perdue acknowledged that he made advances towards her, but claimed that Cooper "wanted it just as much as he wanted it." (Id.).  Johnson fired Perdue as a result. (Cooper Depo., p. 94, lines 1-3, Appx. G).

10.     On August 30, 2000, Cooper was terminated for leaving the plant without permission. (Cooper Depo., pp. 94-96, Appx. G) (Cust. Aff., Exh. 1, Appx. N).[6]   Cooper again complained to Johnson. (Cooper Depo., p. 95, lines 5-12, Appx G).    Cooper explained that her son had gone missing, and maintained that she had obtained permission to leave from "the office." (Id.).  Johnson reinstated her and allowed her to transfer to a new department in order to "start fresh." (Cooper Depo., p. 95, lines 9-12, Appx. G).  Cooper chose to transfer to the Company's Case Ready department as a second shift Quality Assurance Assistant, effective September 14, 2000. (Cooper Depo., pp. 95-96, Appx. G) (Cust. Aff., Exh. 2, Appx. N).

11.     Cooper was promoted to the position of second shift Supervisor in the Case Ready department on January 5, 2006. (Cust. Aff., Exh. 3, Appx. N).  In this position, Cooper oversaw the work of hourly employees assigned to work second shift in Case Ready. (Cooper Depo., p. 105, lines 4-14, Appx. G).  The Case Ready department is generally responsible for preparing the various cuts of meat produced at the Tar heel plant for presentation at customer stores. (Cooper Depo., pp. 100-102, Appx. G). The department is comprised of two specific functions – "front of the room" and "back of the room." (Id.). The front of the room is responsible for making the specific cuts of meat to be packaged, and the back of the room is responsible for packaging and pricing the meat so it can be shipped to customers.

---

[6] The affidavit of Teri Beard, who is an appropriate custodian of records in the Tar Heel facility's human resources department, is cited as "(Cust. Aff., p(p). ___, line(s) ____)."

(Cooper Depo., pp. 101-102, Appx. G). Cooper was assigned to oversee the back of the room, but filled in from time to time in the front of the room. (Id.).

12. As a Case Ready Supervisor, Cooper reported directly to the second shift Case Ready Superintendent. (Cooper Depo., p. 102, lines 12-18, Appx. G). Although the Case Ready Superintendents directed the work of the supervisors, they had no authority to terminate any employee, or even issue discipline. That authority rested solely with HR. (Russ Depo., pp. 25-26, Appx. K)[7] (Lowery Depo., pp. 45, 50, 52, 87, Appx. J). Significantly, the Company employed two different Superintendents on the second shift in the Case Ready department at various times relevant to this case - Tommy Lowery ("Lowery") and Jeffrey Merritt ("Merritt"). (Cooper Depo., pp. 103-104, Appx. G). Lowery was promoted to second shift Case Ready Superintendent on or about July 7, 2005 (Cust. Aff., Exh. 4, Appx. N), and was again assigned to the position effective August 2, 2010 (Cust. Aff., Exh. 5, Appx. N). However, from April 20, 2009, through August 2, 2010, Lowery was assigned to the first shift. (Cust. Aff., Exhs. 5, 6, Appx. N). During this time period, Merritt – not Lowery – was Cooper's second shift Superintendent in the Case Ready department. (Cust. Aff., Exh. 7, Appx. N). Employees on first shift typically finished their shift before 2:45 p.m., (Cooper Depo., pp. 83-84, Appx. G), whereas employees on second shift typically worked from approximately 3:00 p.m. until approximately 2:45 a.m. (Cooper Depo., pp. 96-97, Appx. G); (Russ Depo., pp. 15-16, Appx. K). In other words, Cooper and Lowery had virtually no opportunity to interact at work for a period of nearly sixteen months during the time period that Cooper is alleging Lowery was harassing her on the job.[8]

---

[7] The transcript of the deposition of Tammy Russ, which was taken on June 28, 2016, in Raleigh, North Carolina, is cited as "(Russ Depo., p. ___, line(s) ____)."

[8] The fact that Cooper and Lowery did not work together for sixteen months in the heart of the time period during which Cooper claims Lowery was harassing her casts significant doubt on the veracity of Cooper's allegations in this case. However, and as is required by Rule 56, Smithfield accepts as true all of Cooper's allegations – including her contention as to when those allegations occurred – for purposes of this Motion.

**D.** **Cooper's Knowledge of the Company's Anti-Harassment Policy and COBC**

13.     Cooper was well-aware of the Company's policies on sexual harassment, including the proper process for reporting violations. Cooper was aware that if she had a problem with sexual harassment, she could report the issue to her supervisor, Human Resources, or the employee hotline. (Cooper Depo., 122-123, Appx. G).  Indeed, she made such a report early on in her employment with Smithfield.  *See infra* at ¶ 9.  Cooper received a copy of the COBC when she became a crew leader in Smithfield's shipping department.[9] (Cooper Depo., pp. 119-120, Appx. G).

14.     In June 2010, Cooper and other Tar Heel supervisors and crew leaders attended a meeting to discuss the COBC. (Cooper Depo., pp. 112-116, Appx. G; Exh. 11, Appx. H).  During the meeting, the Company provided training on its policies prohibiting sexual harassment, including the appropriate procedures for reporting sexual harassment. (Id.).  The Company also presented the employees with information concerning Smithfield's employee hotline and provided a card displaying the hotline number. (Id.).  Following the meeting, Cooper executed Smithfield's Fiscal 2011 Annual Business Conduct Certification form certifying that she did "not know about or suspect any unreported misconduct, illegal activities, fraud, misuse of Smithfield's assets or violations of any other Smithfield policy, including but not limited to its policies regarding  . . . sexual harassment and hostile work environment." (Cooper Depo., p. 112, Appx. G; Exh. 11, Appx. H).

15.     In June 2011, Cooper attended another meeting where employees were provided training on the Company's policies pertaining to workplace harassment. (Cooper Depo., pp. 117-119, Appx. G).  The meeting was conducted by Tar Heel's Director of Human Resources, Jaime Pope ("Pope").  Pope reviewed the COBC with the employees in attendance. (Id.).  Following the meeting, Cooper executed the Fiscal 2012 Annual Business Conduct Manual Certification form, again certifying that she did "not know about or suspect any unreported misconduct, illegal activities, fraud, misuse of Smithfield's assets or

---

[9] Cooper initially expressed confusion over whether she had ever seen the COBC prior to her deposition (Cooper Depo., pp. 114-16, Appx. G).  However, she had already produced a copy of the COBC in response to Smithfield's requests for production during discovery (and prior to her deposition). (Pl. Doc. Prod., Exh. D, Appx. C).  When confronted with this fact during her deposition, Cooper begrudgingly admitted she had seen the COBC during her employment.  (Cooper Depo., pp. 112-115, Appx. G).

violations of any other Smithfield policy, including but not limited to its policies regarding . . . sexual harassment and hostile work environment." (Cooper Depo., p. 117; Exh. 12, Appx. G).

**E.    Cooper's Complaint of Harassment by Lowery**

16.    On the morning of July 18, 2011 (during the first shift), Cooper and Brandon Moore ("Moore"), an hourly employee who worked with Cooper on the second shift in the Case Ready department, reported to the Tar Heel facility and met with Plant Manager Kyle Narron ("Narron") and Tar Heel's Operations Manager, Ray Krause ("Krause"). (Cooper Depo., pp. 185-187, Appx. G); (Pl. Inter. Resp., 7, Appx. B); (Pl. Suppl. Inter. Resp., 7, Appx. D).[10]   Cooper informed them that she had been sexually harassed by Lowery. (Id.). Cooper's complaint on the morning of July 18, 2011, was the first notice Cooper provided any member of the Company's management of her allegations against Lowery. (Pl. Inter. Resp., 7, Appx. B); (Pl. Suppl. Inter. Resp., 7, Appx. D); (Pope Aff., ¶¶ 7, 16, Appx. M); (Cooper Depo., pp. 186-187, Appx. G). Cooper was immediately taken to speak with Pope to inform him of her concerns. (Pope Aff., ¶ 8, Appx. M); (Cooper Depo., pp. 186-187, Appx. G).

17.    Pope met with Cooper and Moore that same morning. (Cooper Depo., p. 173, lines 12-19, Appx. G); (Pope Aff., ¶ ¶ 8, 9, Appx. M).   Cooper informed Pope that she believed Lowery was sexually harassing her, and that he had made sexually and racially inappropriate comments to her and others. (Pope Aff., ¶ 8, Appx. M).   Cooper also said that Lowery had yelled at her and a number of other individuals in the production office several days earlier.  (Pope Aff., ¶ 8, Appx. M).  When questioned by Pope, Moore stated that Lowery had yelled at several employees the week before, but conceded he did not have firsthand knowledge of Cooper's sexual harassment allegations. (Pope Aff., ¶ 9, Appx. M).   Moore did not contend Lowery had made inappropriate remarks towards him.  As a result, Pope concluded

---

[10] Although Cooper claims that she made her initial report on July 18th to Krause and Narron, Pope recalls that Cooper and Moore were brought to his office by Plant General Manager Donovan Owens.  (Pope Aff. ¶ 8, Appx. M).  Either way, it is undisputed that Cooper was immediately directed to Pope after her initial attempt to report Lowery on the 18th.

Moore had no material information to provide, and excused him from the meeting. (Pope Aff., ¶ 9, Appx. M).[11]

18.     After Mr. Moore left, Cooper insinuated that she and Lowery had a consensual romantic relationship at one time, but that she had discontinued the relationship because she was married. (Pope Aff., ¶ 10, Appx. M).   Cooper claimed that Lowery continued to ask her to have sex with him, and informed Pope that Lowery harassed her when she declined. (Id.).   Pope asked Cooper if any witnesses could corroborate her claims. (Id.).   Cooper named fellow employees Monica Williams ("M. Williams"), Elijah Locklear ("Locklear") and Sucorya Campbell ("Campbell"), all individuals who worked with her on the second shift in the Case Ready department.  (Id.).   Cooper did not name Brandon Moore. (Id.). Pope concluded his interview with Cooper in mid-morning.  (Id.).   Cooper was scheduled to work the second shift, which began around 2:30 p.m. that afternoon. (Id.).   Pope did not want her to work all night without any sleep since she had worked the night before, so he told her to take the night off, with pay, while he began the investigation.  (Id.).   Pope also asked Cooper to provide him with a written statement, which she agreed to bring to him the following day.  (Pope Aff., ¶ 10, Appx. M).

**F.     Smithfield's Investigation of Cooper's Complaint**

19.     After Cooper left, Pope immediately began his investigation.   That same day, Pope interviewed each of the witnesses Cooper identified (M. Williams, Locklear, and Campbell), and obtained written statements from each of them. None of them could verify or corroborate any of Cooper's specific complaints about Lowery's alleged sexual harassment.[12]   (Pope Aff., ¶ 11, Appx. M).

---

[11] Moore was an hourly employee covered by a collective bargaining agreement ("CBA").  Per the express terms of the CBA, hourly employees are required to submit formal bids in order to move from one job to another. Cooper had elevated Moore's pay several times during the previous year by "promoting" him to a crew leader position without requiring Moore to go through the formal bid process.  Pope had instructed Lowery, Cooper and others at various times to return Moore to his bid position so that the Company would avoid a claim by the Union that it was violating the CBA.  Cooper had also allowed Moore to use her parking pass to park in the supervisor lot even though Moore was not a supervisor.  In other words, Moore received both pay and privileges to which he was not entitled because of  Cooper's actions, some of which violated the CBA.  As a result, Pope was skeptical of Moore's true motivation in coming into the office to support Cooper's claims. (Pope Aff., ¶ 9, Appx. M).

[12] Monica Williams did inform Pope in her written statement that she overheard Lowery saying to no one in particular that before he lost his job over any "bitch," he would kill them.  No one else corroborated her claim.  Ms. Williams has since admitted that Cooper convinced her to fabricate this claim in return for a portion of whatever

20.     That same day, Pope thoroughly interviewed Lowery.  Pope reviewed each of the allegations being made and asked Lowery to respond.  Lowery categorically and emphatically denied ever behaving inappropriately at any time.    Pope asked Lowery whether he made sexual comments or suggestions to any of his employees; Lowery said no.  Pope asked Lowery if he had made offensive or threatening remarks towards or about any of his employees; Lowery said no.  Pope asked Lowery if he had used racial slurs on the floor in front of employees; Lowery said no.  Pope asked Lowery if he ever had an intimate relationship with Cooper; Lowery said no.  Pope asked Lowery if he ever said he would kill any "bitch" who threatened his job; Lowery said no.  Pope gave Lowery numerous opportunities during the meeting to admit that he had behaved inappropriately, but Lowery adamantly denied wrongdoing.  (Pope Aff., ¶ 12, Appx. M) (Lowery Depo., pp. 79-80, Appx. J).  At his deposition, Lowery continued to deny Cooper's allegations against him. Lowery denies all of Cooper's allegations against him. (Lowery Depo., pp. 59-61, 72-77, 79, 92, 95, Appx. J).   Prior to Cooper's complaint, no other employee had complained of harassing conduct by Lowery. (Pope Aff., ¶ 17, Appx. M); (Russ Depo., p. 17, Appx. K) (D. Williams Depo., pp. 30, 43-44, 70, Appx. L).

21.     The following day, July 19, 2011, Pope had Lowery execute a copy of Smithfield's Anti-Harassment policy highlight sheet, to make sure Lowery understood his obligations under the policy (Pope Aff., ¶ 13; Exh. 4, Appx. M).

22.     Cooper returned to Pope's office on July 19th to submit her written statement. (Cooper Depo., pp. 193, lines 4-7, Appx. G; Exh. 15, Appx. H); (Pope Aff., ¶ 14; Exh. 5, Appx. M).   In her statement, Cooper claimed that for some time, she had been "blackmailed" and harassed on the job by Lowery.  Cooper alleged that Lowery asked her to have sex with him, and threatened to get her fired.  According to Cooper's statement, Lowery told her "I will kill you," which Cooper took as a real threat

---

settlement money Cooper obtains from Smithfield, and that she has never heard Lowery make any sexually harassing comments. (M. Williams Aff., ¶¶ 4-6, Appx. L).  Moreover, allegations that Lowery threatened to kill Cooper have already been dismissed by the Court as outside its jurisdiction given Cooper's failure to raise them in her EEOC charge. *See* Order on Motion to Dismiss (No 33).

because Lowery was a drug dealer who can "make things happen."[13]  Cooper claimed that Lowery asked

Moore whether he and Cooper had sex, and whether Cooper had sex with other men.  Cooper complained

that Lowery belittled her when she refused his sexual advances.  Cooper recounted a meeting two weeks

prior during which Lowery asked her to go to Wal-Mart for him, asked her if he could come to her house,

and told her he loved her. According to Cooper, Campbell and M. Williams were present during the

encounter. (Cooper Depo., Exh. 15, Appx. H); (Pope Aff., Exh. 5, Appx. M).

      23.     After submitting her statement to Pope, Cooper informed him that she had talked to her

husband the night before and had decided to resign. (Pope Aff., ¶ 14, Appx. M).  Pope asked Cooper not

to quit, and told her that he had not finished the investigation. (Cooper Depo., p. 194, line 4, Appx. G);

(Pope Aff., ¶ 14, Appx. M).  Pope told Cooper that if he verified her claims, Lowery would be terminated.

(Pope Aff., ¶ 14, Appx. M).  Pope also told Cooper that even if he couldn't verify her claims, he could

move either or both of them so she would need to work with him anymore. (Pope Aff., ¶ 14, Appx. M);

(Cooper Depo., pp. 194-197, Appx. G).  Pope suggested that he could move Lowery from second shift

back to first shift so that he would no longer be supervising Cooper and they would not be in the plant

during the same time. (Id.).  Cooper indicated that was not good enough for her and that she would just

quit. (Id.).  Pope again asked Cooper not to quit. (Pope Aff., ¶ 14, Appx. M).  Pope again gave Cooper the

day off with pay, and encouraged her to go home and talk with her husband some more. (Id.).  Pope asked

Cooper if she had thought of any additional witnesses; Cooper said no. (Id.).  Cooper then stood up, took

off her hardhat, shook Pope's hand and said that she had just come to say goodbye to everyone.  (Id.).

Pope told Cooper that he would continue the investigation even if she resigned, but that Cooper should

not quit before he finished the investigation. (Id.).

      24.     The following day, July 20, 2011, Cooper returned to Human Resources and delivered a

handwritten letter of resignation to one of Smithfield's H.R. generalists. (Pope Aff., ¶ 15; Exh. 6, Appx.

---

[13] Smithfield respectfully contends the Court should not consider these portions of Cooper's statement since they plainly relate to her dismissed allegation that Lowery threatened to kill her.

M); (Cooper Depo., pp. 192-93, Appx. G; Exh. 16, Appx. H). Pope did not get a chance to speak with Cooper again before she handed in her resignation. (Pope Aff., ¶ 15, Appx. M).

25. Pope subsequently reviewed the information he had compiled with his supervisor. They concluded that there was not sufficient information to verify Cooper's claims against Lowery. Pope closed his investigation of Cooper's claims at that time, finding them to be unsubstantiated. (Pope Aff., ¶ 16, Appx. M).

## G. The Full Scope of the Alleged Harassment

26. Cooper filed a charge of discrimination with the Equal Employment Opportunity Commission on or about December 21, 2011. She filed this lawsuit on July 11, 2013. On August 23, 2015, Cooper filed her Fourth Amended Complaint, the live pleading in this case, alleging that she was subjected to unlawful sexual harassment during her employment with Smithfield in violation of Title VII. The parties have developed an evidentiary record through discovery, which sets forth the full scope of Cooper's allegations of the harassment she purportedly suffered, as follows:

- Cooper maintains that Lowery would "verbally cuss me out," refer to her and other employees as "bitches" and "stupid fucks," and would chastise employees because they "got all those white people [Smithfield management] up here looking at his ass." (Cooper Depo., pp. 222-226, Appx. G). According to Plaintiff, Lowery "makes it harder for us to work, physically do the job." (Cooper Depo., pp. 208, 226-27, Appx. G). Lowery's purported conduct was not directed at Cooper, or even to other female employees. Rather, Cooper acknowledged that Lowery's comments were directed at all of the supervisors, both male and female alike. (Id.).

- Cooper alleges that Lowery would stare at her while she was on the Case Ready production floor. (Cooper Depo., pp. 221-222, Appx. G).

- Cooper claims that Lowery determined when she could take vacation, and tried to take vacation on the same day as her. (Cooper Depo., pp. 230-231, Appx. G).

- Cooper alleged that, at the end of their shift, Lowery would leave the facility and go with her to the supervisors' parking lot and ask her "let me go with you." (Cooper Depo., p. 235, Appx. G).

- Cooper alleges that, in 2007, Lowery told her that "he wanted to sleep with [Cooper], because he said he slept with numerous amount of peoples in the room." (Cooper Depo., p. 209, lines 4-8, Appx. G).

- Cooper alleges that, in 2007, and continuing through her remaining employment, Lowery would stand behind her while she was on the production line and brush up against her with

his "front part" while giving her work-related instructions. (Cooper Depo. pp. 209-220, Appx. G). Significantly, Cooper admitted that she did not realize or pay any attention to what Lowery was allegedly doing until a co-worker, Alfreida Davis[14], told her that it didn't seem right. (Cooper Depo., pp. 214-16, Appx. G).

- Cooper alleged that, in 2009 and 2010, Lowery told her that he wanted to sleep with her, and wanted to be with her. According to Cooper, Lowery had a problem with the fact that she was married to a white man, and told her that "he can do things to me that my husband can't do." (Cooper Depo., pp. 228-229, 232, lines 6-24, Appx. G).

- Cooper alleged that Lowery threatened to kill her.[15] (Cooper Depo., p. 197, lines 4-5, Appx. G). When pressed about the allegation, however, Cooper admitted that Lowery did not actually say he was going to kill her. Rather, Lowery said "I have friends in high places," while holding his hands up in the air, which she interpreted as a threat to her life. (Cooper Depo., p. 198, lines 6-10, Appx. G).

- Cooper claimed that, a short time before she resigned, Lowery asked her to do inventory on a Sunday. Cooper stated that, while she was seated and doing paperwork, Lowery walked up behind her and grabbed her coat. According to Cooper, she stood up and immediately pushed him off. When she did, Cooper fell and suffered a cut on her rear. (Cooper Depo., pp. 199–203, Appx. G). Cooper never reported this incident to Pope. (Pope Aff. ¶ 18, Appx. M).

- Cooper alleged that, on or about July 15, 2011, Lowery came into the office where Cooper, Sykoria Campbell, Elijah Locklear, Monica Williams, and Brandon Moore were present. According to Cooper, Lowery began talking to her "like chastising a child." Lowery then, in front of the other employees, told her he loved her, asked her to go to the store for him, asked if she would ride to Wal-Mart with him, asked her to give him a kiss, and then said "you know I love you, don't you?" (Cooper Depo., pp. 182-185, Appx. G). According to Cooper, this was the incident that prompted her to complain about Lowery to Smithfield management. (Cooper Depo., p. 181, lines 5-13, Appx. G).

Discovery in this case has ended, and the record is now ripe for the Court to consider.

Respectfully submitted this 6th day of September 2016.

**SMITHFIELD FARMLAND CORP.**

_/s/ Kurt G. Larkin_____

Melissa A. Romanzo (NC Bar No. 38422)
HUNTON & WILLIAMS LLP
101 South Tryon Street, Suite 3500

---

[14] Cooper did not identify Davis in either her initial disclosures or her discovery responses as a witness with knowledge about the facts of the case because she "didn't feel the need to put it down there." (Cooper Depo., p. 220, line 15, Appx. G). As well, Cooper acknowledged that approximately 12 other employees would have been working near her at any given time when the purported incidents occurred, but did not identify a single employee who witnessed the incidents.

[15] Again, the Court has already ruled it has no jurisdiction to consider this allegation. *See* Order on Motion to Dismiss (No. 33).

Charlotte, North Carolina 28280
Telephone: (704) 378-4700
Fax: (704) 378-4890
Email: mromanzo@hunton.com

Kurt G. Larkin (VA Bar No. 70730)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email: klarkin@hunton.com

Brian C. Ussery (VA Bar No. 88243)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email: bussery@hunton.com

***Counsel for Defendant Smithfield Farmland Corp.***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of September, 2016, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

    Angela Newell Gray, Esq.
    7 Corporate Center Court, Suite B
    Greensboro, NC 27408
    angela@graynewell.com
    *Attorney for Plaintiff*

                                    ***/s/ Kurt G. Larkin***
                                      Kurt G. Larkin

27120.019023 EMF_US 62010795v4